**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**HARRISON DIVISION**

LEO JOURNAGAN CONSTRUCTION
COMPANY, INC.                                              PLAINTIFF

       v.        Civil No. 05-3025

MOUNTAIN HOME CONCRETE, INC.
and TWIN LAKES PROPERTIES, INC.                            DEFENDANTS

**O R D E R**

On the 5th day of December, 2005, the captioned matter came on for trial to the Court, all parties appearing through representatives and all parties being represented by counsel, and the Court heard the testimony of witnesses and received documentary evidence, and now makes the following findings of fact, conclusions of law, and order:

**PROCEDURAL HISTORY**

1. Plaintiff Leo Journagan Construction Company, Inc. ("Journagan") filed suit on April 21, 2005, alleging the existence of a lease agreement (the "Lease" or "Quarry Lease") with defendant Twin Lakes Properties, Inc. ("Twin Lakes") covering real estate known as the Mountain Home Quarry (the "Quarry"), which Lease allowed Journagan to operate a quarrying business at the Quarry. Journagan further alleged that Twin Lakes wrongfully terminated the Lease and allowed defendant Mountain Home Concrete, Inc. ("Mountain Home Concrete") to start using the Quarry.

2. Journagan set up a variety of legal theories upon which it claims a right to possession and control of the Quarry -- or,

in the alternative, damages for loss thereof -- including conversion, trespass, unlawful detainer, unjust enrichment, and ejectment.

3. Journagan initially sought injunctive relief in the form of a temporary restraining order which would keep Mountain Home Concrete out of the Quarry, and allow Journagan to use the Quarry. Before a ruling was made on this issue, the parties were able to work out an accommodation whereby both Journagan and Mountain Home Concrete have had continuing access to the Quarry pending trial. As the Court understands the arrangement, Journagan has sold rock from stockpiles it had built up before Mountain Home Concrete entered on the premises, whereas Mountain Home Concrete has quarried and crushed rock for its own use or sale. That arrangement has been sufficiently successful that the parties agreed to continue it until the Court issued its rulings in this matter.

## **FINDINGS OF FACT**

4. Journagan is a construction company incorporated in and having its principal place of business in the State of Missouri. Journagan is engaged in constructing facilities such as roads and parking lots, which require the use of crushed rock (also known as aggregate) and asphalt. It owns or leases sixteen quarry sites in Missouri and Arkansas from which it obtains rock for its own operations and for commercial sale.

5. On October 24, 1994, Journagan entered into the Quarry Lease with Twin Lakes, an Arkansas corporation whose sole owner and stockholder is Bill Starkey ("Starkey"), by virtue of which it obtained the right to possession and use of the Quarry for mining, quarrying, crushing, stockpiling, and transporting rock. The Quarry Lease ran until November 1, 2009, with an option to renew for an additional ten years. Payment for the Lease was computed by a royalty per ton of rock moved out of the Quarry.

6. During the term of the Quarry Lease, Journagan periodically stationed a portable rock crusher at the Quarry, and used it to crush various types and sizes of aggregate. This aggregate was then either used, sold, or stockpiled. After a period of time, the crusher would then be rotated to a different quarry, and sales of aggregate at the Quarry would continue to be made from the stockpiles. The timetable for movement of the crusher was not fixed, being based instead on business needs, but on average the crusher was rotated into the Quarry about every 12-18 months.

7. On the last rotation, in January and February, 2005, a smaller crusher was brought than had been used previously. This smaller crusher was quicker and easier to move, and required fewer men to operate, thus tending to economize the operation of the Quarry, which was not profitable at the time. The crusher was moved out of the Quarry sooner than was usual, because it was

needed to keep up with the press of work Journagan then had in Missouri.

8. The business of using and selling aggregate required the loading and weighing of trucks at a scale house. Journagan's loader, scale house and scales at the Quarry remained in place even during periods when the crusher was relocated to another quarry, and Journagan kept a scalemaster at the Quarry to handle commercial sales of aggregate even when no crusher was on site.

9. Journagan's largest commercial customer at the Quarry was Mountain Home Concrete, which is an Arkansas corporation whose sole shareholder is Mike Dilbeck ("Dilbeck"). Dilbeck is the son-in-law of Starkey, who is the sole shareholder of Twin Lakes. Mountain Home Concrete bought approximately 85% of the rock sold at the Quarry for use in its ready-mix concrete business.

10. At some point in early 2005, the relationship between Journagan and Mountain Home Concrete became strained. Journagan's witnesses attributed this strain to a large past-due balance on the part of Mountain Home Concrete, but Mountain Home Concrete offered evidence that its account balance was no larger than usual.

Dilbeck attributed the strain to the fact that Journagan had moved its portable crusher to another quarry without leaving what he considered sufficient stockpiles of the aggregates he used in Mountain Home Concrete's business -- whereas Journagan's witnesses

testified that Journagan had promised to keep Mountain Home Concrete supplied by hauling aggregate as necessary to the Quarry[1].

11. Regardless of the cause of the strain, it is clear that by late February, 2005, Dilbeck was thinking about getting into the quarry business himself. While the exact dates and sequence of the situation are difficult to determine, the following is the Court's understanding of the events which then occurred -- and when they occurred.

12. On February 21, 2005, Dilbeck learned that Journagan's crusher was going to be rotated out of the Quarry. He talked with Journagan's Vice President for Operations, Noel Kearns, about the situation on February 22.

On either the 22nd or the 23rd of February, Dilbeck bought a ticket to Albuquerque, New Mexico, where a rock crusher was to be sold at auction on Feburary 24, 2005. He flew to Albuquerque on the 24th and bought the crusher.

13. On March 16, 2005, Bryan Holt and Terry Maples, employees of Journagan, met with Dilbeck to discuss the possibility of Dilbeck subleasing the Quarry[2]. The meeting did not go well. Dilbeck did not want to pay to sublease the Quarry

---

[1] Under the terms of the Lease, Twin Lakes is entitled to the same royalty on rock hauled in and stockpiled and sold out of the Quarry as on rock actually mined out of the Quarry.

[2] The Quarry Lease provides for subleasing, with consent of the landowner, which consent "shall not be unreasonably denied."

when his father-in-law (Starkey) owned it, and was offended when Holt and Maples brought up the subject of "shrinkage" of inventory -- feeling that he was being accused of stealing.

14. On March 16, 2005, Dilbeck's attorney filed papers to incorporate a business for Dilbeck named North Central Arkansas Quarry, Inc. It is not clear whether Dilbeck ever actually carried on any operations under this business name, however.[3] He owned several businesses during the relevant time, and he did not keep their business operations separate and distinct, but used the identities of these separate businesses to suit his own convenience. Dilbeck was not even able to testify about which of his businesses actually purchased the crusher, or an asphalt plant bought a few weeks later.

15. On March 21, 2005, Allen Journagan, President and CEO of Journagan, sent Dilbeck a letter noting that Journagan intended "to maintain our existing lease with Twin Lakes Properties," and offering various options under which it would be willing to sublease the Quarry to Dilbeck.

16. On a Saturday in "late March," Kearns had what he described as an "unfriendly" talk with Dilbeck, triggered by the fact that Journagan had parked a piece of equipment in such a way that it blocked access to the Quarry. Dilbeck told Kearns to "get

---

[3] Both defendants admitted in their Answers that Twin Lakes had "purported to authorize Mike Dilbeck, d/b/a Mountain Home Concrete, to begin operation in the Mountain Home Quarry."

his shit and get out," whereupon Kearns told Dilbeck to "go to hell, we have a lease." Dilbeck responded, "you don't have shit. Get out."

17. Also in late March, 2005, Dilbeck purchased an asphalt plant. The rock crusher and the asphalt plant amounted to a combined investment of some $1,500,000.00. Both pieces of equipment were intended for use in, and with the products of, a rock quarry, and it is clear that Dilbeck intended to move them in and set them up at the Quarry. Both were purchased while the Quarry Lease between Journagan and Twin Lakes was in effect.

When asked how he planned to operate at the Quarry without a sublease from Journagan, Dilbeck testified that he would "just haul the crusher in and start crushing," pointing out that the landowner was his father-in-law, Starkey.

18. As of April 4, 2005, Journagan refused to sell any more aggregate to Mountain Home Concrete, putting the company on what it called a "credit hold." At this point, Dilbeck had brought his crusher to the Quarry, and it was being set up.

19. On April 6, 2005, a lawyer representing Twin Lakes faxed to a lawyer representing Journagan a letter purporting to terminate the Quarry Lease pursuant to paragraph 16 of that document. Paragraph 16 of the Quarry Lease provides as follows:

> During the duration of this Lease agreement, the Lessee shall carry on in a workman-like manner, the quarrying operations herein described, and shall use best efforts to maximize the economic benefit to the Lessor.

> Operations shall not be interrupted except on account of unavoidable accidents, strikes, governmental order, rule or regulation, or other conditions beyond the control of the Lessee, or on account of unsatisfactory market conditions making it impractical, in the opinion of Lessee, to quarry and sell at a reasonable profit. Should any of the events listed in this paragraph as excusing performance of the Lessee occur, the Lessor shall be free to terminate and cancel this lease.

20. The April 6, 2005, termination letter did not indicate which of the events in paragraph 16 were relied upon by Twin Lakes as sufficient to allow it to terminate the Quarry Lease.

Starkey testified that he terminated the Lease because Dilbeck told him that Journagan had left and was not coming back.

Dilbeck testified that he asked Starkey to terminate the Quarry Lease so that he could move in and start crushing rock at the Quarry -- and that he did not want to sublease the Quarry because Starkey already owned it.

21. Paragraph 5 of the Quarry Lease also deals with termination. It provides, in relevant part, as follows:

> Upon failure of the Lessee to comply with any material term or condition of this contract lease. . . the Lessor shall have the privilege of terminating this lease agreement and re-entering and re-taking possession of the premises and this agreement shall be thenceforth at an end.... Before exercising the power of termination herein agreed, the Lessor shall first give forty-five (45) days written notice of default, stating the cause, in order that the Lessee shall have opportunity of correcting such default.

There is no evidence that Journagan had failed to comply with any material term or condition of the Lease as of April 6, 2005. The evidence did not, for example, show a lapse of insurance,

-8-

nonpayment of taxes, or any defect in the necessary environmental permits. Nor is there evidence that Journagan had failed to use "best efforts to maximize the economic benefit to the Lessor." Although Journagan had temporarily interrupted the crushing of rock, it had not ceased operations at the Quarry. The interruption was consistent with its past history at the Quarry. Sales of aggregate continued, and royalties to Starkey had not been interrupted as of the date he purported to terminate the Lease.

## **CONCLUSIONS OF LAW**

22. Complete diversity exists in this matter, and no party has voiced an objection to personal jurisdiction. The events in suit took place in and around Mountain Home, Arkansas. The Court, therefore, concludes that it has both subject matter and personal jurisdiction, and that venue is properly laid.

23. At all relevant times, Starkey considered himself to be, and acted as, the *alter ego* of Twin Lakes and Dilbeck considered himself to be, and acted as, the *alter ego* of Mountain Home Concrete.

24. The Court concludes that this case can be resolved upon Journagan's pleaded action of ejectment, which is a cause of action that "may be maintained in all cases in which the plaintiff is legally entitled to the possession of the premises." **A.C.A. §18-60-201.**

In order to recover on such a cause, a plaintiff need only "show that, at the time of the commencement of the action, the defendant was in possession of the premises claimed and that the plaintiff had title thereto or had the right to the possession thereof...." **A.C.A. §18-60-206.**

25. The Court concludes that Mountain Home Concrete and/or Dilbeck were, at the time of commencement of this action, and are now, in possession of the Quarry by virtue of placing its/his crusher and asphalt plant in the Quarry and commencing operations there. While Journagan has been allowed to sell from its stockpiles in the Quarry pending disposition of the issues, the Court finds that the intent and purpose of both Mountain Home Concrete/Dilbeck and Twin Lakes/Starkey were and are to prevent Journagan from rotating its crusher back into the Quarry and conducting quarry operations, so that Mountain Home Concrete/Dilbeck can conduct such operations there in its stead. Thus, the Court finds that the conduct of the defendants has effectively ousted Journagan from possession of the Quarry.

26. The Court also concludes that Journagan is the party entitled to possession of the Quarry. The Quarry Lease provides Journagan such right to possession of the Quarry, unless and until that Lease is properly terminated or expires by its terms. As will be seen later, the Court does not believe the Lease has been properly terminated and it has not expired by its terms.

27.  Under the terms of the Lease, there are only five circumstances under which the Lessor can terminate the Lease without giving the Lessee notice and an opportunity to cure. Those circumstances are set out in paragraph 16 of the Lease.

The only one of the five which even arguably applies to the facts of this case is the last: "unsatisfactory market conditions making it impractical, in the opinion of Lessee, to quarry and sell at a reasonable profit." The evidence, however, makes it clear to the Court that this circumstance did not exist -- nor was there any reason for the defendants to believe it existed -- when Dilbeck moved his crusher to the Quarry or when Twin Lakes notified Journagan that it was terminating the Lease.

The following facts -- many of which were known to the defendants -- are clear evidence that Journagan was not of the opinion that it was impractical to quarry and sell rock from the Quarry at a reasonable profit:

\*   Journagan told Dilbeck, in its March 21, 2005, letter, that it "intend[ed] to maintain our existing lease with Twin Lakes Properties."

\*   It was the regular custom and practice for Journagan to move a portable crusher into and out of the Quarry from time to time, such that moving the Quarry was no indication that Journagan intended to abandon the Lease.

\*   It was the press of business in Missouri, rather than

"unsatisfactory market conditions" in Arkansas, that prompted the relocation of the crusher.

* While the Quarry had not actually been profitable for Journagan in the time period before the last rotation of the crusher, the company was taking steps to make it profitable, one of which was the use of a smaller crusher.

* Journagan kept its loader, scale house, scales, and scalemaster on site after rotating the crusher to another quarry.

* Dilbeck wanted to set up crushing and asphalt operations in the Quarry, and asked Starkey to terminate the Lease in order to allow him to do that without the cost of subleasing from Journagan.

Because none of the circumstances listed in paragraph 16 of the Quarry Lease existed, the Court finds that Twin Lakes' attempt to terminate the Lease under that paragraph was ineffective and did not result in a termination of the Lease.

28. In order to terminate the Lease under paragraph 5 of the lease, Twin Lakes would have had to give Journagan notice and an opportunity to cure whatever default prompted the notice.

The termination letter did not cite this provision in the Lease; no indication of a default was given; and Journagan was not allowed any opportunity to clear up any perceived problems. Indeed, Starkey did not contact Journagan about any alleged breach of the Lease or about the latter's intentions concerning it before

-12-

instructing his lawyer to write the termination letter. Instead, he relied on the self-serving input of his son-in-law, Dilbeck, as to these issues even though he knew that Dilbeck wanted to take over the Quarry himself.

There is no showing that Journagan was in default on the Lease and the Court concludes there was no termination of the Lease under the provisions of paragraph 5.

29. Because the Quarry Lease was never properly terminated, it remains a viable contract between the parties. Journagan is the party with the right to possession and it has been wrongfully dispossessed by the combined actions of Mountain Home Concrete and Twin Lakes with the result that both are liable in an action of ejectment.

30. Twin Lakes contends that the matter is controlled by **Morley v. Berg, 218 Ark. 195, 235 S.W.2d 873 (1951),** which recited the applicable Arkansas law on mining leases, as follows:

> Even in the case of private persons it is well settled that the lessor of a mining lease is entitled to assert a forfeiture if the lessee fails to develop the leasehold with a view to the best interests of both parties. We have often pointed out that since the principal consideration to the lessor is his expectation of receiving royalties, there is an implied obligation on the part of the lessee to develop the entire property so that the lessor may obtain the expected income that induced him to grant the lease. Of course the rapidity with which the lessee should proceed with his development depends upon the particular circumstances of each case, but in the absence of an agreement to the contrary the implied duty of complete development is inherent in all mining leases that provide a royalty to the lessor.

**218 Ark. at 197-98** (internal citations omitted).

The foregoing is an accurate statement of Arkansas law on the subject and would, under the right set of circumstances, justify a finding that a mining lease had been terminated as a matter of law. This case, however, does not present that right set of circumstances.

There is no evidence that Journagan failed to develop the entire Quarry, or failed to operate the Quarry with a view toward the best interests of both itself and Twin Lakes. While the evidence shows that stockpiles were smaller than usual when Journagan rotated the crusher out of the Quarry in February, 2005, it also shows that Journagan had committed to keep its customers supplied by hauling in aggregate if necessary. Under the terms of the lease, Twin Lakes is entitled to the same royalty on aggregate hauled in from elsewhere as on aggregate mined at the Quarry, so the royalties due the lessor would not be affected so long as Journagan continued its commercial sales out of the Quarry. The evidence showed that, as of the date of the termination letter, Starkey was still receiving regular royalty checks.

The Court does not accept the notion (based almost entirely on Dilbeck's assertions) that the stockpiles left -- coupled with Journagan's promise to haul -- were so small and inadequate as to amount to an abandonment of the Lease. Even if that were the

case, there is no evidence that Twin Lakes ever brought this problem to Journagan's attention so as to give it an opportunity to correct it.

31. The Court has considered whether it is incompatible with the terms of the Quarry Lease for Twin Lakes to permit Mountain Home Concrete to occupy the Quarry. Paragraph 15 of the Lease provides that the Lessor "shall be free to make such other use of such property as does not interfere with the rights of the Lessee to posses[s] and quarry such property."

It is the Court's conclusion that this provision does not authorize the lessor to "make use" of the property by allowing a third party to occupy it and conduct quarrying operations thereon while the property is under lease to the lessee for that same purpose. The Lease grants Journagan the right to quarry, including the right to "strip the surface or excavate, dig, bore, shaft, quarry, and otherwise explore for and mine said creek gravel, rock and limestone deposits." Having given these broad rights to quarry, Twin Lakes cannot properly enter into an agreement with another quarry operator which would allow it to carry on the same activities in the same space as are permitted to Journagan under the Lease.

32. The Court has also considered whether the conduct of Mountain Home Concrete, being carried out with the permission of Twin Lakes, is wrongful and actionable. It concludes that the

permission granted by Twin Lakes has not given Mountain Home Concrete a right of possession superior to that of Journagan. Where parties to an action in ejectment trace their right to possession to a common source, "the one must prevail who has the superior equity." **Brooks v. Johnson, 250 Ark. 309, 465 S.W.2d 103 (1971),** citing **Collins v. Heitman, 225 Ark. 666, 284 S.W.2d 628 (1955).** When the Court considers that Journagan had the leasehold by virtue of a written contract which was not properly terminated, and that Dilbeck manipulated his father-in-law so as to oust Journagan for Dilbeck's own purposes, it is clear that Journagan has the superior equity.

33. The Court concludes that defendants are also liable for conversion. To establish a claim for conversion, "a plaintiff must prove that the defendant wrongfully committed a distinct act of dominion over the property of another, which is a denial of or is inconsistent with the owner's rights." **Hatchell v. Wren, --- Ark. ---, --- S.W.3d ---, 2005 WL 1532965 (2005).** The same analysis that leads to a conclusion that defendants are liable in ejectment leads to a conclusion that they converted the Quarry to their own uses from and after the date that Dilbeck caused his rock crusher to be placed in the Quarry and told Kearns to get out.

34. The Court also concludes that Mountain Home Concrete committed the tort of trespass. A trespasser is "a person who goes

upon the premises of another without permission and without an invitation, express or implied." **AMI Civil 2005, 1107.** While Mountain Home Concrete had the permission of Starkey and Twin Lakes to enter the Quarry, it used that permission to prevent Journagan from enjoying its leasehold. To the extent that Mountain Home Concrete's entry prevented Journagan from its rightful use of the premises, Mountain Home Concrete trespassed on Journagan's leasehold.

35. The Court is not persuaded that either defendant is liable for unlawful detainer. A person is guilty of unlawful detainer if he peaceably and lawfully obtains possession of land, and then holds it willfully and unlawfully after demand made in writing for the surrender of possession by the person having the right to possession. **A.C.A. §18-60-304.** The facts as found by the Court do not fit this cause of action.

36. The Court also does not find that either defendant has been unjustly enriched by its conduct in this matter.

To find unjust enrichment, a party

must have received something of value, to which he or she is not entitled and which he or she must restore. There must also be some operative act, intent, or situation to make the enrichment unjust and compensable. One who is free from fault cannot be held to be unjustly enriched merely because he or she has chosen to exercise a legal or contractual right. In short, an action based on unjust enrichment is maintainable where a person has received money or its equivalent under such circumstances that, in equity and good conscience, he or she ought not to retain.

**Hatchell v. Wren**, --- Ark. ---, --- S.W.3d ---, 2005 WL 1532965 **(2005)** (internal citations omitted).

The evidence showed that Journagan voluntarily rotated its crusher out of the Quarry before Dilbeck moved his crusher into the Quarry, and that it would have been a year or more before Journagan rotated a crusher back to the Quarry. The presence of Dilbeck's rock crusher has not, to date, prevented Journagan from crushing rock because Journagan would not have been crushing rock if Dilbeck had not brought in his crusher. Nor is there evidence that Dilbeck's crushing operation has served to deprive Journagan of future profits. There was no evidence that the rock in the Quarry would be depleted within the term of the Lease or any renewal thereof.

Journagan has also not been deprived of the profit it anticipated on the sale of stockpiled aggregate, because under the agreement reached by the parties pending trial, Journagan has been permitted to sell the aggregate it has stockpiled at the Quarry. It can thus be seen that, while Dilbeck should not have placed his equipment in the Quarry in the first place, any profits he has made by doing so, and any royalties he has paid Starkey, were not obtained at the expense of Journagan. The Court does not believe these are such circumstances that, in equity and good conscience, Dilbeck or Starkey ought not be allowed to retain such profits as they may have gained by their misconduct.

37.  For all the foregoing reasons, the Court finds that Journagan is entitled to the recovery of possession of the Quarry premises, and for a Writ of Possession if such is required to effect its remedy.  The Court does not find that Journagan has sustained any monetary damages in this matter.

38.  Journagan also seeks an award of costs and attorney's fees.  It is entitled to, and will be awarded, its costs.

The claim for attorney fees is predicated upon **A.C.A. §16-22-308**, which provides in relevant part that

> [i]n any civil action to recover . . . for . . . breach of contract, unless otherwise provided by law or the contract which is the subject matter of the action, the prevailing party may be allowed a reasonable attorney's fee to be assessed by the court and collected as costs.

While Journagan did not plead breach of contract in this matter, it is clear from the Court's analysis that the validity of the Quarry Lease, and whether it was properly terminated (or else breached, as the case must be) were the central issues in this case.  The Court, therefore, concludes, that this was a civil action to recover for breach of contract, thus entitling Journagan, as the prevailing party, to an award of attorney's fees.  Journagan may submit a petition for same within fourteen days, and defendants will have fourteen days thereafter to file any objections thereto.

**IT IS THEREFORE ORDERED** that Mountain Home Concrete, Inc., and Twin Lakes Properties, Inc., are liable to Leo Journagan

Construction Co. for ejectment, conversion, and trespass, and are directed to turn over possession and control of the Mountain Home Quarry to Leo Journagan Construction Co. within fourteen days of the date of this Order, failing which, and upon application to the Court therefor, a writ of ejectment will issue.

**IT IS FURTHER ORDERED** that Leo Journagan Construction Co. has not shown its right to any award of money damages as a result of the conduct of Mountain Home Concrete, Inc., or Twin Lakes Properties, Inc.

**IT IS FURTHER ORDERED** that plaintiff's claims of unlawful detainer and unjust enrichment are hereby **dismissed**.

**IT IS FURTHER ORDERED** that plaintiff will be awarded its reasonable attorney's fees and costs, upon timely submission within fourteen days of a petition therefor, and that defendants may have fourteen days to file any objections to such petition.

**IT IS SO ORDERED**, this 20th day of December, 2005.

                                            **/s/ Jimm Larry Hendren**
                                            **JIMM LARRY HENDREN**
                                            **UNITED STATES DISTRICT JUDGE**